## McCAFFREY et al. v. DAY et al.

### (Circuit Court of Appeals, Ninth Circuit. January 5, 1920.)

### No. 3295.

1. **MINES AND MINERALS** ⟺83—**DEED AND CONTRACT TO FURNISH MONEY FOR DEVELOPMENT HELD SEPARATE TRANSACTIONS.**

In an action for failure to comply with a mining contract, evidence regarding the deeding of mining property in certain proportions to plaintiffs, who had an option on the property, and defendants, who furnished the necessary money, and the execution on the following day of a contract under which defendants agreed to furnish money for developing the property, *held* to sustain findings that the contract was not a part of the consideration for the deeds.

2. **MINES AND MINERALS** ⟺83—**EVIDENCE ESTABLISHING COMPLIANCE WITH CONTRACT TO FURNISH MONEY FOR DEVELOPMENT.**

In an action against a defendant for refusing to furnish money for the development of mining property under a contract committing the operation and development of the mine to defendant's best judgment, uncontradicted evidence that the location of a claim was probably invalid until certain location work had been done, that property was inaccessible,

that completion of a nearby power plant would save considerable money, etc., *held* to sustain findings that defendant did not act arbitrarily or in bad faith in refusing to advance more money.

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit by Edward McCaffrey, R. C. McCaffrey, and Mary Dena McCaffrey against Harry L. Day, Mrs. Harry L. Day, whose true name is Helen D. Day, J. D. Finley, and Mrs. J. D. Finley. Judgment for defendants, and plaintiffs appeal. Affirmed.

Graves, Kizer & Graves, of Spokane, Wash., for appellants.

W. W. Zent, of Spokane, Wash., Isham N. Smith, of Seattle, Wash., John H. Wourms, of Wallace, Idaho, and C. B. Nolan and William Scallon, both of Helena, Mont., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. A careful examination of the record in this case satisfies us of the correctness of the judgment of the court below denying the rescission of the contract between the parties, sought by the suit. The bill was based upon the alleged failure and refusal of the appellee Day to comply with the terms of the contract, and upon the allegation that such refusal by him was arbitrary and in bad faith, and "not in the exercise of his judgment, or of any discretion conferred upon him by the agreement."

The contract related to certain mining property situated in Lincoln county, Mont., consisting of the Heron lode mining claim, the Cabinet lode mining claim, the Galena lode mining claim, and a mill site known as the Cabinet mill site, situated on Callahan creek, in Troy mining district. In 1910 the property belonged to a corporation called Big Eight Mining Company, and during that year it was leased to the appellant R. C. McCaffrey (one of the complainants below) by the company, with an option to purchase the same within a certain stated time for $50,000; deeds therefor being placed in escrow with Northwestern Loan & Trust Company, to be by it delivered to the purchaser upon the payment of the purchase price. The lessee entered into possession of the property under the lease and commenced working the ground, in which undertaking he was joined by his son and co-complainant below, Edward McCaffrey, during the progress of which work they shipped a number of cars of lead and zinc ore; the appellant Edward McCaffrey, who was a plumber, having invested in such work a considerable amount of money out of his business, stated to be from $15,000 to $20,000. His father was a prospector and miner. The appellee J. D. Finley (a defendant below) was vice president and a director of the Exchange National Bank of Spokane, Washington, of which bank Day was also a director, and he was a friend of the McCaffreys, and acted for them in their dealings regarding the property here in question. As the time approached for the exercise of the option to purchase the property, the McCaffreys, through Finley, opened negotiations with an eastern corporation called Grascelli Chemical Company for the advance of the necessary $50,000 with which to

make the purchase, and for the development of the property, which negotiations were pending at the time Finley, for the McCaffreys, applied to Day with the same end in view; Finley preferring the latter for the reason, particularly, that he was an experienced and competent mining man, as well as one of abundant means. That he was experienced and competent is sufficiently shown by the fact that he had been the manager of the large and important Hercules mine of that section of the country.

The evidence shows that Finley knew nothing about mining, but that he was himself able to advance the $50,000 with which to effect the purchase of the property, and told Day, as well as the younger McCaffrey, that he was willing to do so if necessary, but, being anxious to interest Day, for the reason that has been stated, went with him in the fall of 1912 to see the property. While no one, we think, can justly claim from the evidence in the case that the property had been sufficiently opened up to be called a mine, Day, according to his own testimony, regarded it as a good prospect—so good, indeed, that he said he would, with Finley, advance, in certain proportions, the necessary $50,-000 to make the purchase and $50,000 more for the development of the property. But when it came, as it did, according to the evidence, to the proposition that such purchase money be so advanced upon an assignment of the lease and bond, Day, after an examination of the papers by one of his attorneys, and consultation with him, refused the proposition. Thereafter, time being of the essence of the escrow agreement, haste became necessary, and Day, having then gone to Spokane, summoned his attorney, Mr. Wourms, there, who arrived at Spokane on the morning of the 15th of January, 1913, when, according to his testimony, Day handed him the abstract of title to the property and requested him to examine it as expeditiously as possible and advise him respecting it; that about the time of Wourms' completion of the examination of the abstract Finley and the younger McCaffrey came to the room of the hotel where he and Day were, and that he informed them that, while there were some minor defects in the abstract, it was sufficient, but that he wished to see the deeds that were in escrow, and which were to be delivered upon the payment of the money, and that he and McCaffrey then went to the Northwestern Loan & Trust Company to see the deeds, where the cashier of the bank allowed him to examine them, but said that they had been notified by the Big Eight Mining Company not to deliver them; that he and McCaffrey then returned to the hotel, where they found Finley and Day, to whom he reported the result of the visit to the Trust Company, including his report that the deeds were sufficient, and—

"advised them that the thing to do was to prepare deeds, immediately, make a tender. That seemed to appeal to all the gentlemen present, and they began to discuss for some little time as to the interest that each one was to have. I was interested," said the witness, "in Mr. Day's interest. Mr. Day insisted on 55 per cent., and there was some talk backward and forward, and the one remark that I recall that Mr. McCaffrey made was that that would only give himself and his father 25 per cent.; that they had spent two years on the property and that wasn't enough. Mr. Day then suggested that 51, what he wanted was control, and he wouldn't go in unless he did get control, and 51 per cent. was just as good for control as 55; that he was willing to

reduce his demand to 51 per cent. That was agreed upon, and I immediately proceeded to prepare a deed from the McCaffreys to Mr. Harry L. Day. I completed that deed; as I recall it Mr. McCaffrey and Mr. Finley went away."

The witness further testified that he and Finley then went to the bank to get the money, and that on the way Finley told him that he might just as well prepare a deed for him also, which the witness did before going to the bank. The deeds so prepared by Wourms were from the McCaffreys to Day and Finley for 51 and 14 per cent., respectively, in the property, to pass to and through the McCaffreys from the Big Eight Company. The witness further testified that immediately after he had prepared the deed for Finley the two proceeded to the Exchange National Bank, where Day directed that he be given $50,000 in money which was done, and, it being heavy, he and the younger McCaffrey took it in a taxicab to the Northwestern Trust Company and made the necessary tender. The witness further testified that the next morning, January 16th—

"Mr. Finley came to our rooms at the hotel, that we used as a kind of a workshop, and informed me that he thought that Mr. Day and himself ought to enter into an agreement for the purpose of putting up the money; that the McCaffreys were not able to advance any money to amount to anything in the development of the property; and as I recall it I told Mr. Finley that I didn't see any need of it; that the mining partnership law of the state of Montana was sufficient for all purposes, and Mr. Finley then went away. Mr. Day came to the room a short while afterwards, and informed me that he had seen Mr. Finley, and that they had agreed that they would enter into an agreement with the McCaffreys for the purpose of advancing some money, and requested me to put their agreement, as he narrated it to me, into form. I proceeded to do so, and it was discussed backward and forward, and several drafts made of it that morning by Mr. Day and Mr. Finley and myself.

"Q. That would be on the morning of the 16th? A. On the morning of the 16th.

"Q. Of January? A. On the morning of the 16th of January, as I recall it; and finally we succeeded in getting a draft that was satisfactory to Mr. Finley and to Mr. Day. Then Mr. Edward McCaffrey came to the rooms with reference to the agreement; he read it over, and he asked me whether I would object to going up to Mr.—

"Q. Henley's? A. Henley's, I think; Henley's office; and we went up to Mr. Henley's office, Mr. McCaffrey and myself.

"Q. Do you remember about the time that you got to Henley's office? Is there anything that occurred there— A. I believe Mr. McCaffrey will recall it. We waited quite a while for him to return from lunch; that is, he was out when we went up there.

"Q. Well, now, when Henley came in, and as the result of the visit that you made to his office there, was there any addition made to the agreement as it then stood? A. As I had written the agreement, there was no proviso in it that if any of these causes should arise that would absolve these people from—Mr. Day and Mr. Finley from—working the property, unless the conditions that made it necessary to desist putting up the money should be permanent, that they should in the future be obliged to go ahead, and he suggested to me that there ought to be some phraseology of that class in the agreement. And I told Mr. Henley, in the presence of Mr. McCaffrey, that personally I didn't see any objection to adding an arrangement of that kind.

"Q. And are you able to refer to the particular clause that was added to the contract, on account of the suggestion made by Mr. Henley? A. Yes, sir; a clause in paragraph 8, after the comma, in the fifth line from the bottom of that paragraph, reading like this: 'But nothing herein shall be

construed to finally release the said parties of the first part from their obligation to furnish said money as aforesaid, unless the obstacles to the operation and development of the same shall be permanent.'

"Q. And then was there a redrafting of the contract as it was amended? A. I took the matter up with Mr. Day and Mr. Finley, and told them that I thought that was fair, and there was no objection, and I redrafted such portions of the contract as was necessary to insert that clause."

In substance the clause so suggested is found in the contract which it is sought by this suit to rescind. It appears from the testimony of both Finley and the McCaffreys that the former was their representative in the transactions in question, and from the testimony of both Finley and Edward McCaffrey that the latter was present several times during the discussions regarding the matter on the 16th day of January, 1913, when the terms of the agreement were finally settled and reduced to writing by Wourms; and while Edward McCaffrey does not deny requesting Wourms to go, or going with him, to Henley's office, he does positively deny that the latter was his attorney. We insert a brief excerpt from the testimony of that witness:

"Do you remember going to Mr. Henley's office on the 16th, or were you to Mr. Henley's office during the time that these negotiations were carried on? A. I don't remember of it.

"Q. Do you remember going there in company with Mr. Wourms, and waiting during the noon hour until Mr. Henley returned? A. I don't remember.

"Q. In reference to this agreement? A. I don't remember it at all.

"Q. Well, would you say that you were not? A. I couldn't say whether I was or I wasn't; I don't remember.

"Q. Well, now, again trying to refresh your recollection in reference to that, do you remember going to Mr. Henley's office? Mr. Henley was acting as attorney for you, wasn't he? A. No, no; never was.

"Q. Never acted for you in any way? A. No capacity at all; never.

"Q. You never consulted him? A. Never consulted him in regard to any of my business at all.

"Q. Well, in regard to this business? A. No; nor no business.

"Q. Now, do you remember going to his office—

"Mr. Graves: I submit that he has just said that he didn't.

"The Court: Well, that doesn't necessarily dispose of this question; it is cross-examination.

"Q. Do you remember about this provision being inserted in this contract at the instance of Mr. Henley, when you and Wourms were present: 'But nothing herein shall be construed to finally release the said parties of the first part from their obligation to furnish said money as aforesaid, unless the obstacle to the operation and development of the same shall be permanent.' A. Well, I told you that I didn't see them papers; never seen them until the day I signed them at the bank; never seen them, nor no part of them; had nothing to do with the making, and know nothing about it."

The record shows that the two deeds, as well as the contract, were signed and acknowledged before a notary public at the same time, to wit, January 17, 1913. The contract in its first, second, and third paragraphs, respectively, set forth the interest of each of the parties in the property, that is to say, fifty-one one-hundredths in Day, fourteen one-hundredths in Finley, and thirty-five one-hundredths in the McCaffreys jointly; and the fourth, fifth, and sixth paragraphs recited in substance that in the judgment of the respective parties the proper development and operation of the property required the installation of

suitable mining and milling machinery and other equipment, and their desire to develop, equip, and operate the property, and the willingness of Day and Finley to advance money in proportion to their ownership, for that purpose, upon condition that such advances should bear a specified rate of interest and be repaid out of the first profits derived from the operation of the property, or, in the event no such profits should be earned, that they should have the right to remove therefrom all of the machinery, etc., with certain other provisions, in the event of a sale of the property, not necessary to be mentioned. The foregoing were followed by paragraphs 7 and 8, which are as follows:

"(7) Now, therefore, in consideration of the premises, and the mutual benefits which will accrue to the parties hereto, it is hereby agreed that the parties of the first part [Day and Finley] will advance, in proportion to their ownership in the property, as it may be required in the judgment of said Harry L Day, the money necessary to operate and further develop and equip the said property up to and not exceeding the sum of fifty thousand ($50,000) dollars. This money to be furnished on the express condition that the parties of the first part shall be reimbursed for their advances together with interest thereon from date said sums are furnished, at the rate of six per cent. (6%) per annum out of the first profits arising from the operation of the property. In the event that there be no profits, they shall have the right to remove therefrom any and all machinery and improvements which may be placed thereon and shall credit the actual cash value of all said machinery and improvements, at the time they are removed, on the account for money advanced by them, or in the event of the sale of the said property before the parties of the first part shall have been fully repaid for their advances with interest thereon as aforesaid, the parties of the first part shall first be reimbursed for any and all advances made by them, with interest thereon as aforesaid, from the money derived from the sale of said property, before any of the proceeds thereof shall be divided among the owners of the property.

"(8) It is hereby further agreed that, if the duty on ores and metals be reduced by Congress, or if, in the course of the operation and development of the property, the physical condition should be such, or if from any other cause or causes beyond the control of the said parties of the first part, it shall in the judgment of the said Harry L. Day not be profitable and advantageous to continue the installation of machinery and the development and operation of the property, then and in that event the said parties of the first part shall not be obliged to make further advances, nor to continue the operation or development of the said property, even though they have not advanced the full sum of fifty thousand ($50,000) dollars at that time; but nothing herein shall be construed to finally release the said parties of the first part from their obligation to furnish said money as aforesaid, unless the obstacles to the operation and development of the same shall be permanent."

The contract further gave to Day and Finley an option to purchase the interests of the McCaffreys in the property, and in the event of its transfer to a corporation an option to purchase their stock in such corporation at the same price and on as good terms and conditions as they (the McCaffreys) might be offered by third parties—such option to be exercised within 30 days after receiving a like notice of the offer. It further provided that Day, or some person designated by him, should at all times have the general management and control of the property, and that, in the event a corporation should be organized to take it over, Day, or such person or persons as he might select, should be elected president or general manager thereof—

"it being the intention of the parties to this agreement that the said Harry L. Day, by reason of his ownership of fifty-one one-hundredths (51/100) of

the mining claims hereinbefore described, and of his long and successful experience as an owner and operator of mines, shall have the control and management of the said property and of the corporation to be hereafter organized."

It is insisted on behalf of the appellants that the contract was an essential part of the consideration for the deeds from the McCaffreys, which consideration failed in a material part by reason of Day's refusal "arbitrarily and in bad faith, and not in the exercise of his judgment or of any discretion conferred upon him by the agreement," to advance the money or to do anything required of him thereby, in consequence of which the appellants are entitled to a decree rescinding the contract and requiring the reconveyance by Day and Finley of their interests in the property, upon the return to them of such amounts of money as the court should deem equitable.

[1, 2] The court below found the evidence to be insufficient to show that the contract was a part of the consideration for the deeds, and in that view we agree. We think that fairly shown by the specific facts testified to by the witness Wourms, and which found strong support in the testimony of Day. We also agree with the court below that the proof fails to show that the latter acted in bad faith or arbitrarily. It undoubtedly shows that the McCaffreys, as well as Finley, were anxious and insistent that he proceed promptly to install machinery and work the property, and even suggested the erection of a mill. The complete answer to such suggestions is that by the agreement of the parties the development and operation of the property was left to the honest judgment of Day. He testified, among other things, that he found that the location of the Galena claim was invalid, for the reason that there had been no discovery of mineral within its boundaries, and that therefore he directed the extension of a tunnel on one of the other claims into the Galena ground for the purpose of making the necessary discovery, and that for the protection of the property, in the event it should prove to be a valuable one, it was desirable to locate some adjoining ground and to acquire a claim called Thomas claim, all of which took more or less time, and of which all of the parties to the agreement were informed; that the location of the property was about six miles from the railroad, the roads poor, and the hauling of ore and supplies therefore necessarily costly, especially when the snows were on the ground; that in the event a mine should be found in the property an independent production of power for the operation of a mill would be very costly, but that a nearby mine was being equipped with electric power by means of water from which power might be furnished through the operator of it, with whom he was on friendly terms and who had actually consented to supply it—that plant costing about $350,000. None of these matters so testified to by Day are denied, and we think they furnish very good and sufficient reasons for the delay that occurred in the expenditure of any large sum of money; but the evidence shows without conflict that a very considerable amount of development work was done from time to time under Day's direction, in which the appellants joined up to, indeed, a very short time preceding the commencement of this suit.

We discover nothing in the record tending to show any desire on Day's part to take any unfair advantage of his associates, and are of the opinion that the judgment of the court below is right; and it is accordingly affirmed.